James W. WOODSON

v.

SCOTT PAPER COMPANY.

Civ. A. No. 93–6076.

United States District Court,
E.D. Pennsylvania.

Aug. 4, 1995.

Alan B. Epstein, Jablon, Epstein and Wolf, Philadelphia, PA, for plaintiff.

Steven R. Wall, Marina C. Tsatalis, Julie A. Uebler, Morgan, Lewis & Bockius, Philadelphia, PA, for defendant.

## MEMORANDUM

LUDWIG, District Judge.

Defendant Scott Paper Company's post-verdict motion for judgment as a matter of law, to alter the judgment or, in the alternative, for a new trial, will be granted in part and denied in part. Plaintiff James W. Woodson's motion for prejudgment interest will be granted. The verdict will be reduced to $1,496,698.70.

This employment discrimination action, filed November 16, 1993, was brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.;* the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; and Pennsylvania common law. On December 23, 1994, summary judgment for defendant was granted in part. Order, No. 93–6076, Dec. 23, 1995; memorandum, No. 93–6076, Jan. 9, 1995. The remaining claims proceeded to trial on February 7, 1995.

At trial, the following evidence, as viewed most favorably to plaintiff, was adduced. In 1970, plaintiff, an African American, was recruited for employment by defendant Scott Paper Company to work as a chemical materials specialist in Philadelphia. Feb. 8, 1995, N.T. 24; Feb. 13, 1995, N.T. 9–10; Plaintiff's exh. 1, at 5, 93. He was soon promoted and for almost 20 years, through 1990, received numerous promotions, positive performance evaluations, merit wage increases, bonuses and awards. N.T. passim.

In November 1989 and February 1990, plaintiff filed charges of discrimination against defendant with the EEOC and the PHRC alleging that Scott had not considered him for top-level management positions because of his race. Feb. 8, 1995, N.T. 47–53; Feb. 13, 1995, N.T. 49–59. In October, 1990, he was promoted to product system leader of Light Weight Wet Strength—Napkins at defendant's Chester plant.

In the following year, defendant undertook a company-wide reorganization of its management team. A "forced ranking" or evaluation was made of 27 managers, and the bottom five were terminated. Plaintiff finished 25th and was terminated on January 27, 1992 without prior notice. Defendant's only other African American manager was also ranked in the bottom five. The evaluations were performed without interviews, and two of the three evaluators had little familiarity with plaintiff's work. Plaintiff's annual evaluations were higher than or comparable to a number of the managers who were ranked above him.

On February 15, 1995 the jury returned a verdict in favor of plaintiff on his retaliatory discharge claim and for defendant on the race discrimination claim. Inherent in the jury verdict was the finding that the rating system used to select him for termination was pretextual. The verdict of $1,557,845 included $150,000 in back pay, $397,845 in future earnings, $10,000 for emotional distress, and $1,000,000 in punitive damages.

Defendant's post-verdict motion challenges the exhaustion of administrative remedies under the PHRA, the sufficiency of the evidence, and the jury instructions; and alternatively, the amount of the verdict. Plaintiff

moves for prejudgment interest on the backpay award.[1]

## I.

█ Defendant contends that this court lacked jurisdiction over the PHRA claim because the prerequisite administrative charge was not filed with the Pennsylvania Human Relations Commission.[2] 43 Pa.S.A. § 962. Without jurisdiction over the Pennsylvania law claim, the verdict amount, other than backpay,[3] would be subject to the $300,000 limitation of Title VII, as amended. 42 U.S.C. § 1981a(b)(3).[4]

On July 22, 1992, plaintiff filed an administrative complaint with the EEOC alleging the facts giving rise to this action. Feb. 14, 1995, N.T. 5–6. However, he did not file with the PHRC, and his response to a request for admission concedes that his EEOC complaint was not cross-filed with the PHRC. Feb. 14, 1995, N.T. 5–6.[5] Also, on the EEOC charge form, he did not check the box requesting that the charge be filed with both agencies. Plaintiff's exh. 93. Nonetheless, by letter of July 29, 1992, the EEOC advised plaintiff, "You should be aware that the Commission will provide a copy of your charge to the [PHRC] in accordance with our procedures." Plaintiff's response to defendant's motion for summary judgment, Oct. 18, 1994, exh. I. The record also includes a copy of a form from the EEOC to the PHRC, dated July 29, 1995, which purports to transmit plaintiff's charge to that agency. Plaintiff's exh. 93.[6]

Had the EEOC perfected the filing of the charge with the PHRC, in accordance with its letter and transmittal form, there would have been a sufficient PHRA filing for jurisdictional purposes. *Vincent v. Fuller Co.*, 532 Pa. 547, 551, 616 A.2d 969, 971 (1992), citing, *Lukus v. Westinghouse Electric Corp.*, 276 Pa.Super. 232, 419 A.2d 431 (1980). Plaintiff had no reason to believe a cross-

1. By letter dated June 30, 1995, plaintiff's motion for reinstatement was withdrawn.

2. The same argument was made in defendant's summary judgment motion, memorandum, Jan. 9, 1995 at 2–3, and at trial. This issue was not waived, the answer to the complaint having denied administrative remedies exhaustion. Answer ¶ 6. This is not a case where the defense was first raised on appellate review. *E.g., Daugherity v. Traylor Bros. Inc.*, 970 F.2d 348, 351–52 (7th Cir.1992); *Nat'l Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 940 (D.C.Cir.1987).

3. It is unnecessary to decide whether the future earnings portion of the verdict would be subject to the cap.

4. His argument to the contrary, plaintiff's retaliation claim cannot be said to have "grown out" of his previously filed administrative charges inasmuch as PHRC's earlier investigation had been closed before he was terminated. *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984) (test is whether additional charges "are reasonably within the scope of the complainants's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims"). *See Snyder v. Pennsylvania Assoc. of School Retirees*, 389 Pa.Super. 261, 273–74, 566 A.2d 1235, 1241 (1989) (retaliation claim filed with PHRC 19 months after age and sex discrimination claim required separate exhaustion). It is correct that his EEOC charges were still open, and these foreclosed his PHRC proceedings, *see infra* at 9 n. 11. However,

preparatory to the present action, he filed new charges with the EEOC. *Id.*

5. At trial, defendant's counsel read into the record requests for admissions, including:

Second request for admission, James W. Woodson did not file a charge of discrimination with the Pennsylvania Human Relations Commission based on the acts alleged in EEOC charge number 170921474 and Mr. Woodson's EEOC charge number 170921474 was not cross-filed with the Pennsylvania Human Relations Commission. That request for admission was admitted.

*Id.*

Whether this means that plaintiff did not cross-file or that the charge was not sent by the EEOC, or, if sent, was not received or was mislaid by the PHRC has not been argued.

6. In support of its present motion, although not part of the trial record, defendant proffered a form purportedly signed by plaintiff dated July 22, 1992 entitled "Acknowledgement of Right to File a Complaint":

I hereby acknowledge that I have received a letter advising me of my right to file a complaint under the Pennsylvania Human Relations Act. I am aware that I must file with PHRC within 30 days, or else I will lose those rights to relief under state law safeguarded by filing under the Pennsylvania Human Relations Act. I understand that this form is not a formal complaint.

The EEOC letter informing plaintiff that his charge had been transmitted to the PHRC was dated one week later.

filing had not occurred, and, in any event, defendant was not prejudiced by the lack of PHRC processing.

In these circumstances, the EEOC's notice to plaintiff should be considered an equitable filing. Case law has not regarded the filing requirement jurisdictional where the failure or breakdown has been in the administrative system. *See Hicks v. ABT Assoc., Inc.,* 572 F.2d 960, 967 (3d Cir.1978) (jurisdiction existed under Title VII where EEOC improperly refused to accept administrative filing); *Griffiths v. CIGNA Corp.,* 857 F.Supp. 399, 405 (E.D.Pa.1994) (exhaustion of administrative remedies under PHRA is procedural and subject to estoppel and waiver); *Feingold v. Bell of Pennsylvania,* 477 Pa. 1, 10, 383 A.2d 791, 795–96 (1978) ("The rule requiring exhaustion of administrative remedies is not intended to set up a procedural obstacle to recovery"). PHRA's exhaustion of remedies provision mandates liberal construction to accomplish the Act's purposes. 43 Pa.S.A. § 962(a).[7] To deprive plaintiff of his state claim in this unusual situation would frustrate the remedial purpose of the statute. *See Parsons v. City of Philadelphia Coordinating Office of Drug and Alcohol Abuse Programs,* 833 F.Supp. 1108, 1113 (E.D.Pa. 1993) (PHRA jurisdictional requirement could be met if plaintiff had received some notice from the EEOC that her charge would be dually filed). Under the EEOC–PHRC worksharing agreement,[8] once the EEOC charge was filed, the PHRC's interest in the case was automatically terminated. *Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874, 879 (3d Cir.1990). As a result, the lack of perfected filing with the PHRC could not have worked any prejudice in practical terms to either that agency or defendant. *See EEOC v. Commercial Office Products*

*Co.,* 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988).

In an analogous setting, it was held that "a filing with the [Philadelphia Commission on Human Relations] constitutes actual and sufficient compliance with the PHRA." *Kedra v. Nazareth Hosp.,* 857 F.Supp. 430, 433 (E.D.Pa.1994). *See also Davis v. United States Steel Supply,* 581 F.2d 335, 339 (3d Cir.1978) (Pittsburgh Human Relations Commission filing satisfied PHRA).[9] *But see Herbert v. Greyhound Lines, Inc.,* No. 93–5447, 1994 WL 493732, *1 (E.D.Pa.1994) ("The mere filing of a Title VII complaint with the EEOC, however, does not constitute processing by the PHRC or satisfy the PHRA administrative requirements which have been held to be preclusive"). Under *Hicks v. ABT Assoc., Inc.* and other defective filing cases, there appears to be ample basis for jurisdiction over plaintiff's PHRA claim.

## II.

Defendant's motion also contests the sufficiency of the evidence. To establish a *prima facie* case of retaliatory discharge under Title VII,[10] a plaintiff must show that: "(1) he was engaged in protected activity; (2) he was discharged after or contemporaneous with the activity; and (3) a causal link existed between the protected activity and threats to sue, and the loss of his job." *Robinson v. SEPTA,* 982 F.2d 892, 895 n. 1 (3d Cir.1993), citing *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991), and *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Defendant concedes the first two elements but maintains that plaintiff did not present the minimum

---

**7.** The Pennsylvania Supreme Court has stated, "A liberal construction for the accomplishment of the purposes of the act is not synonymous with a relaxation of the rule of exclusivity for the benefit of a complainant." *Fye v. Central Transportation Inc.,* 487 Pa. 137, 142, 409 A.2d 2, 5 (1979). Here, however, it seems that plaintiff specifically intended a filing with the PHRA.

**8.** The Worksharing Agreement for Fiscal Year 1994 was part of defendant's summary judgment motion, exh. O.

**9.** *Fye,* 487 Pa. at 142, 409 A.2d at 5, is distinguishable because no worksharing agreement was at issue.

**10.** Title VII standards generally apply to PHRA actions. *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 471 n. 14 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

quantum of evidence necessary for a jury to find the third element, the causal connection.

To review the evidence on this issue, plaintiff's administrative charges, filed in November, 1989 and February, 1990, were pending at the time of his discharge, in January, 1992.[11] Two of the three evaluators who performed the "forced ranking" were aware of the charges when they assigned plaintiff the numerical grades that resulted in his termination. Feb. 9, 1995, N.T. 171–76, 187; Feb. 10, 1995, N.T. 9. Both the human services director and plaintiff's supervisor, who discussed these rankings with the evaluators during the ranking process, were also aware of his discrimination complaints. Feb. 9, 1995, N.T. 12; Feb. 10, 1995, N.T. 57–58. A "confidential work shedding memorandum" prepared by plaintiff's supervisor for the rankers predicted "An emotional reaction from [plaintiff] could result in an age/race discrimination claim," and an increase in employee racial tension. Plaintiff's exh. 69.[12] These predictions could reasonably have been interpreted by the jury as warnings based on the previously filed discrimination charges—warnings that went unheeded.[13]

Earlier, when plaintiff had filed his second administrative charge of discrimination, he was given a written performance evaluation recommending that he consult a behavioral psychologist in North Carolina. Feb. 13, 1995, N.T. 78. According to plaintiff, his work performance had remained constant. *Id.* at 71–79. Arguably, this recommendation, appearing in a formal written evaluation, was a response to his perception of racial animus among his superiors. It was also communicated to him orally. None of the evaluations mentioned his having any difficulty in getting along with his subordinates.

When plaintiff was eventually promoted in 1990 after a number of requests, it was to lead the poorest performing division. *Id.* at 80–86. He was paid at a lower level than similarly situated colleagues and denied adequate staffing and management support. Plaintiff's exh. 10, 112, 125. This assignment was consistent with his theory that he was being set up for failure—and that this was the way the company had decided to deal with his discrimination charges. Moreover, according to plaintiff, the director of human resources for manufacturing had told him to withdraw the administrative complaints, which he refused to do. Feb. 13, 1995, N.T. 89, 185–86.

There was testimony that in June, 1991, racial graffiti appeared in a men's room at the Chester plant: "Nigger, I'm going to get you"; "Niggers are taking our jobs"; "Niggers who talk are niggers who hang." Feb. 13, 1995, N.T. 108. Plaintiff was the only black management employee there. Defendant's response to this type of hate speech was portrayed by plaintiff as inadequate, thereby buttressing the evidence of retaliatory motive. *See id.* at 110; Feb. 10, 1995, N.T. 93–98; Feb. 14, 1995, N.T. 47–56. Later that year, despite his qualifications, he assertedly was not given adequate consideration for an important promotion. Feb. 14, 1995, N.T. 25–26.

Other evidence supported plaintiff's claim that the ranking was a pretext for retaliation. He had an excellent employment record and strong performance evaluations over a period of more than 20 years. Feb. 8, 1995, N.T. 31–39; Feb. 9, 1995, N.T. 91, 102–04; Feb. 13, 1995, N.T. 29–33, 63–79; plaintiff's exh. 2, 3, 4, 5. However, two of the rankers admitted they had little first-hand knowledge of plaintiff and did not review his personnel file or performance evaluations. Feb. 2, 1995,

11. Defendant's supplemental exhibits show that plaintiff's PHRC charges were deferred to the EEOC and closed February 21, 1991. A00081. The EEOC charges remained pending. That some two years had passed from the date of filing to the date of termination does not preclude a finding of causation. *Robinson,* 982 F.2d at 894–95 ("The mere passage of time is not legally conclusive proof against retaliation"), *citing, Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 43 (5th Cir.1992).

12. This memorandum was dated December 17, 1991, prior to the final decision to terminate plaintiff.

13. In a recommendation section, the memorandum states, "If EEOC sensitivity too high—reassign in Chester...."

N.T. 135; Feb. 10, 1995, N.T. 6–8; Feb. 13, 1995, N.T. 196, Feb. 14, 1995, N.T. 34. Allegedly critical discrepancies between the performance evaluations and the rankings were not presented to the special corporate review committee that had the power to overrule plaintiff's termination. Feb. 8, 1995, N.T. 111–12, 152–53; Feb. 10, 1995, N.T. 154–55; plaintiff's exh. 69.

The jury may also have been persuaded to find retaliatory intent by its evaluation of the demeanor and comportment of some of defendant's witnesses. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant … may, together with the elements of the prima facie case, suffice to show intentional discrimination"). Each of the rankers as well as some of plaintiff's supervisors and colleagues testified over a period of seven days, reviewing the ranking process and plaintiff's performance in voluminous detail, with hundreds of graphs, charts and internal memoranda. It was elicited that one of the evaluators was of the opinion that plaintiff was a "borderline insubordinate." Feb. 9, 1995, N.T. 231–34.[14] After plaintiff began asking to be promoted, his performance evaluations contained references to difficulties in relating to superiors. Defendant's explanation is that plaintiff was unwilling to accept the new team management approach, known as "Asset Optimization." *Id.* Plaintiff disagreed and blamed the negative comments in the evaluations on his repeated promotion requests. This issue was argued to the jury, which could have concluded that plaintiff's superiors considered his administrative charges to be the ultimate act of insubordination. Until plaintiff sought to be promoted, his performance evaluations had been uniformly excellent. Viewed from plaintiff's perspective, the evidence of a causal link between the discrimination charges and his termination was substantial.

## III.

There was also sufficient evidence to withstand defendant's objections to the punitive damages award. The jury found that defendant acted with malice or reckless indifference to plaintiff's rights.[15] *See* 42 U.S.C. § 1981(a)(b)(1); *Jackson & Coker, Inc. v. Lynam,* 840 F.Supp. 1040, 1051 (E.D.Pa. 1993), *aff'd,* 31 F.3d 1172 (3d Cir.1994). As outlined above, the evidence adequately supported that finding.

Specifically, there was evidence that plaintiff was promoted in 1990 in order to persuade him to withdraw his administrative complaints. When he would not do so, defendants attempted to ensure his failure on the job by denying him management resources. Even so, under his direction his division rose within a year from last place in the company. Shortly thereafter, a purportedly neutral ranking system was utilized to discharge him. *Supra,* pt. I. The rankers and the director of human resources knew that retaliation was illegal. Feb. 9, 1995, N.T. 13–14, 171–76, 187; Feb. 10, 1995, N.T. 10. The evidence that plaintiff was regarded by at least one evaluator as "borderline insubordinate," whatever that may mean in a racial setting, underscored the likelihood of severe retaliatory animus.

## IV.

Defendant asserts that the jury instructions were erroneous, necessitating a new trial, Fed.R.Civ.P. 59. The disputed instructions are the term "motivating factor" in the retaliation instruction—without the addition of "determinative effect"—and the use of the term "direct evidence" in an instruction relating to the evidence of racial graffiti.

---

14. This expression, which was brought out on cross-examination, appeared in an affidavit in support of defendant's summary judgment motion as an explanation for plaintiff's low rating.

15. Jury question four asked:
   In unlawfully terminating plaintiff James W. Woodson, did defendant Scott Paper Company act with malice or with reckless indifference to his rights—for which conduct punitive damages are awarded?

   ____ Yes     ____ No

   If Yes, what is the amount of punitive damages?

### A.

As to plaintiff's burden of proof under Title VII and the PHRA, the jury was instructed as follows:

> Under both of these acts, it is unlawful for an employer to discriminate against an employee because of his race or because the employee has filed an administrative charge of discrimination against the employer which is permitted by those acts.
>
> If such discrimination, either because of race or in retaliation for the filing of a charge, results in an employment decision such as the employee's termination, it is an unlawful employment practice....
>
> [Plaintiff] need not prove that his race or the alleged retaliation was the only factor or reason or the most important factor or reason in the employer's decision. But, he must prove that either race or retaliation was a motivating factor or reason. In other words, that it played a role in Scott's decision to terminate him....
>
> In any event, in such a case, the ultimate question, the final question for the jury to decide is whether, based on all the evidence in the case, plaintiff has proven by a preponderance of the evidence that he was discharged either because of his race or in retaliation for filing the charges. In other words, that race or retaliation was a motivating factor, a factor that played a role in the employment decision to terminate him.

Feb. 15, 1995, Charge 3–7.

The issue presented is whether the proper standard in a pretext case is "motivating factor," and not "determinative factor" or "determinative effect." In pretext actions arising before the Civil Rights Act of 1991, "determinative factor" or "determinative effect" has been the rule. *E.g., Starceski v. Westinghouse Electric Co.,* 54 F.3d 1089 (3d Cir.1995); *Wilson v. Susquehanna Township Police Dept.,* 55 F.3d 126, 130 (3d Cir.1995).

However, the 1991 Act speaks solely of "motivating factor":

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m). As to retaliation, the statute provide in an unamended section, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3(a).[16] There has been no case reported specifically holding that "determinative" survives the 1991 legislation. That term, which also did not appear in the prior law was a decisional outgrowth of the *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) formulation of "but for" causation. *See infra* at 21.

Defendant's first argument is that 42 U.S.C. § 2000e–2(m) does not apply to 42 U.S.C. § 2000–3(a) because it enumerates "race, color, religion, sex, or national origin," but not retaliation. At trial, the following objection was made:

> Your Honor, just for the record, I'd like to note my objection to instructing on the motivating factor without adding a reference to "had a determinative effect" on the case. To the extent that you are instructing them similarly under the PHRA, I have the same objection.

*Id.* at 19. The specific ground for objection was that a motivating factor instruction does not apply to pretext cases. *See infra.* Defendant had filed a nine-page pretrial brief to this effect which contained no reference to statutory construction. Accordingly, this contention, not made until post-trial, is deemed waived.[17]

---

**16.** The statute also provides, "It shall be an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race, color, religion, sex, or national origin.... 42 U.S.C. § 2000e–2(a)(1)."

**17.** Under Fed.R.Civ.P. 51, counsel must object to jury instructions by "stating distinctly the matter objected to *and the grounds of the objection."* (Emphasis added.) Defendant objected to a specific matter, but not on the grounds now asserted. *See Seman v. Coplay Cement Co.,* 26 F.3d 428, 437 n. 12 (3d Cir.1994) (failure to raise issue of whether "a" rather than "the" was correct article modifying "determinative factor" constituted waiver); *Abraham v. Pekarski,* 728

But waiver aside, the evidentiary burden revisions in the 1991 Act were narrowly focused on *Price Waterhouse v. Hopkins* and the distinctions between disparate impact and disparate treatment cases. The use of the term "unlawful employment practice" was continued in the new discrimination subsections, 42 U.S.C. § 2000e–2(a)–(d). As section 2000e–2(m) makes clear, "Except as otherwise provided in this subchapter" the burden of proof in unlawful employment practice cases shall be "motivating factor." The only other burden of proof provision, 2000e–2(k), relates to disparate impact cases. The terms "race, color, religion, sex or national origin" are not restrictive and are the predicates for filing a retaliation claim. Our Circuit regularly applies the standard of proof under § 2000e–2 to retaliation claims under § 2000e–3. *E.g., Griffiths*, 988 F.2d at 468–69; *Jalil*, 873 F.2d at 706–07.

To prescribe different standards of proof would be illogical and unnecessarily confusing. Here and in numerous other cases, *e.g., Jalil*, 873 F.2d 701 (3d Cir.1989), discrimination and retaliation claims arise as part of the same matrix.[18] The Fourth Circuit and district court cases have applied the 1991 amendments to retaliation cases. *See Beinlich v. Curry Development, Inc.*, 54 F.3d 772 (table), 1995 WL 311577, *3 (4th Cir. May 22, 1995) (unpublished disposition) (sections 2000e–2(m) and 2000e–3(a) together mandate motivating factor test in retaliation cases); *Hall v. City of Brawley*, 887 F.Supp. 1333, 1342 (S.D.Cal.1995) (applying 2000e–5(g)(2)(B), which incorporates 2000e–2(m), to

retaliation case); *Lewis v. American Foreign Service Ass'n*, 846 F.Supp. 77, 82 (D.D.C. 1993) ("Therefore, the Court deems it proper to apply the Civil Rights Act of 1991 ... to retaliation cases"); *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1316 (E.D.Pa. 1994) (§ 2000e–2(m) applies to retaliation cases). *See also* Edward J. Devitt et al., Federal Practice and Instructions § 104.03 (4th ed. 1992 & Supp.1994) (including retaliation claim within motivating factor instruction). *But see Riess v. Dalton*, 845 F.Supp. 742, 744–45 (S.D.Cal.1993).

Defendant's chief argument at trial was that § 2000e–2(m) was meant to apply only to "mixed motive" cases. This case proceeded on a "pretext" theory. Accordingly—defendant reasoned—§ 2000e–2(m), despite its inclusive and unambiguous language, should be disregarded in favor of a "determinative effect" instruction à la *Miller v. CIGNA Corp.*, 47 F.3d 586 (3d Cir.1995), an ADEA case.[19]

There is no clear consensus regarding the application of § 2000e–2(m) to pretext cases. *Compare Davies v. Philip Morris, U.S.A.*, 863 F.Supp. 1430, 1437 (D.Colo.1994) ("To prevail on sex discrimination claim under Title VII, a plaintiff must prove, either directly or indirectly that her sex was a motivating factor for the employment action of which she complains") *with Hennessy v. Penril Datacomm Networks*, 864 F.Supp. 759, 762 (N.D.Ill.1994) (no application unless sufficient direct evidence for mixed motives instruction).[20] Standard jury instruction man-

---

F.2d 167, 172 (1984) (failure to object to punitive damages instruction with regard to sufficiency of evidence constituted waiver), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822; *Bogacki v. American Machine & Foundry Co.*, 417 F.2d 400, 406–07 (3d Cir.1969) ("[W]e wish the record to state that we object to the failure on the part of the Court to charge on warranties" did not comply with R. 51 because it did not specify the kind of warranty relied upon); *Dostal, v. Baltimore & O.R. Co.*, 189 F.2d 352, 356 (3d Cir.1951) ("A mere statement that counsel objects ... with no indication as to the grounds for the objection does not satisfy either the letter or the spirit of R. 51"). Defendant does not assert fundamental error. *Bogacki*, 417 F.2d at 407.

**18.** Defendant, citing *Battaglio v. General Electric Co.*, No. 94–4675, 1995 WL 11980, *6 (E.D.Pa.

Jan. 5, 1995), argues that the causal link element of the prima facie retaliation case entails a heightened burden of proof. In *Battaglio*, however, plaintiff's retaliation claim failed because there was no actual or constructive discharge. *Id.* Causation was immaterial.

**19.** Plaintiff's belated argument that there was sufficient evidence to merit a mixed motives instruction must be rejected.

**20.** Defendant has cited a number of cases that are not on point. *Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1261 n. 11 (D.N.J. 1994) stated in dicta that the 1991 Act "did not change the 'direct evidence' requirement necessary to support a mixed motives case." However, *Maidenbaum* was an ADEA case, and that statute was not amended. *Doe*, 862 F.Supp.

uals recommend utilizing "motivating factor" in both types of cases. According to the Eighth Circuit Manual of Model Civil Jury Instructions (1995):

> Prior to these amendments ... liability standards depended upon whether the case was classified as a "pretext" case or a "mixed motive" case. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under the Civil Rights Act of 1991 ... the plaintiff prevails on the issue of liability if he or she shows that discrimination was a "motivating factor" in the challenged employment decision.

*See also* American Bar Association Model Jury Instructions for Employment Litigation 1.02[1], 1.02[2][a] (1994) (using "motivating factor" regardless of nature of evidence); Edward J. Devitt et al., Federal Practice and Instructions, *supra* at 18 § 104.03.

Many courts also utilize § 2000e–2(m) in both mixed motive and pretext cases. *Iqbal v. Berkeley Marina Marriott Management,* No. 93–3575, 1995 WL 166026, *2 (N.D.Cal. April 5, 1995) (motivating factor standard regardless of type of case); *Hall,* 887 F.Supp. at 1342 ("Where the court finds that discrimination was a motivating factor in the adverse employment action, a violation of Title VII is established"); *Gray v. Brown,* No. 93–2732, 1994 WL 621977, *3 (N.D.Cal. Nov. 1, 1994); *Guerin v. American Telephone & Telegraph,* No. 93–1522, 1994 WL 245937, *4 (N.D.Cal. June 1, 1994) (same); *Turic v. Holland Hospitality, Inc.,* 849 F.Supp. 544, 552 (W.D.Mich.1994) (applying section in pretext case). *See Lam v. University of Hawaii,* 40 F.3d 1551, 1564–65 (9th Cir.1994); *Sheppard v. Riverview Nursing Centre, Inc.,* 870 F.Supp. 1369 (D.Md.1994); *Johnson v. El Paso Pathology Group, P.A.,* 868 F.Supp. 852, 862–63 (W.D.Tex.1994).

Our Circuit has left open whether the motivating factor instruction should be given in pretext cases. In *Hook v. Ernst & Young,* 28 F.3d 366, 368, 371 (3d Cir.1994), "motivating factor" was held not to apply retroactively to a pretext case. Also, in *Miller,* in holding that a "determinative effect" instruction was proper in a pretext case under the Age Discrimination in Employment Act, the Circuit explicitly did not decide whether § 2000e–2(m) affected the burden of proof for Title VII pretext cases. 47 F.3d at 598 n. 10. *See also Armbruster v. Unisys Corp.,* 32 F.3d 768, 771 (3d Cir.1994).

The legislative intention to overturn *Price Waterhouse v. Hopkins* is clear. *See* H.R.Rep. No. 102–40(I), 102nd Cong., 1st Sess. 45, 48 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 586. However, the amendment does not limit itself to a *Price Waterhouse*-type of mixed motives case. The concern of both the plurality and the dissent in *Price–Waterhouse* was causation— the meaning of "because of" in the statutory scheme. In overturning that decision, Congress has unequivocally spelled out a simple, comprehensive definition. With the exception of disparate impact cases, it extends to all "unlawful employment practices." The salutary result is a uniform approach to all Title VII disparate treatment cases.[21]

Moreover, contrary to defendant's view, a "motivating factor" instruction does not shift the burden of proof. Plaintiff at all times has the burden of showing by a preponderance that defendant was motivated by a discriminatory purpose. *See* Feb. 15, 1995, Charge, N.T. 3. The necessary quantum of evidence is changed. Once it is produced, defendant has a partial "mixed motive" affirmative defense that in any event it would have taken the same employment action

---

1310 (E.D.Pa.1994) arose under the ADA, also not amended, and was not a pretext case. *Mickens v. Penn Mutual Ins. Co.,* No. 93–6875, 1994 WL 396396, **9–10 (E.D.Pa. July 29, 1994) implicitly endorsed a pretext/mixed motives distinction during a bench trial but then concluded, "Plaintiff has not met her burden of persuasion by a preponderance of the evidence that defendant's reasons are not to be believed or that defendants were more likely *motivated* by discriminatory reason for terminating the plaintiff"

(emphasis added). *EEOC v. Horizons Hotel Corp.,* 831 F.Supp. 10, 12 n. 2, 15 n. 12 (D.P.R. 1993) arose before the 1991 amendment.

**21.** This view comports with the concurring opinion of Judge Greenberg in *Miller,* 47 F.3d at 599 ("Thus unlike the en banc majority, I would dispense altogether with the terms "pretext" and "mixed motives" and hold explicitly that the same standard applies to all disparate treatment cases").

**308**

against plaintiff.[22]  42 U.S.C. § 2000e–5(g)(2)(B); ABA Model Jury Instructions 1.01[2]. Just as in the ordinary tort or contract case, plaintiff's burden does not shift, despite defendant's opportunity to present an avoidance defense.

■ Here, if it was error not to instruct on "determinative effect," it appears that the jury would nevertheless have reached the same conclusion. The jury specifically found not only that defendant was motivated by an unlawful consideration, but also that it acted "with malice or reckless indifference to [plaintiff's] rights." Jury verdict form. The quantitative or qualitative distinction between "motivating" and "determinative" would therefore seem to have been immaterial to the retaliation verdict.

### B.

■ As regards the significance of the presence of racist graffiti, the jury was instructed that:

> There was evidence of race-biased graffiti in a bathroom at the Chester plant. An employer that permits such graffiti to exist may be held responsible for the racial bias conveyed by it if it condones the graffiti or acquiesces in it.
>
> All of the facts and circumstances, including the employer's reaction, the steps, if any, taken by the employer to counteract the graffiti and what was reasonably required given the nature of the racial provo-

cation, should be considered in deciding whether the employer's alleged lack of appropriate response bears on its racial attitude. In other words, it is direct evidence of the employer's intent to discriminate.

Feb. 15, 1995, charge, N.T. 8. Defendant objects that its response to the graffiti was not relevant to either the race or retaliation claim,[23] so that the characterization of it as "direct" evidence was prejudicial.

■ Under Fed.R.Evid. 401,[24] relevancy is a broad standard. Evidence is not to be excluded "solely because its probative value is extremely low." [25] Weissenberger's Federal Evidence § 401.3. Here, one issue was whether defendant acted with retaliatory animus in terminating plaintiff.[26] In an analogous case, our Court of Appeals, in agreement with the Eighth Circuit, has pointed out that "an atmosphere of condoned sexual harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." *Glass v. Philadelphia,* 34 F.3d 188, 195 (3d Cir.1994) (citing *Hawkins v. Hennepin Technical Center,* 900 F.2d 153, 155 (8th Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). *See also Josey v. John R. Hollingsworth,* 996 F.2d 632, 641 (3d Cir.1993) (discriminatory motive for firing of employee can be inferred from evidence that management permitted an atmosphere of racial prejudice to infect the workplace).[27]

22. Here, although discussed at the charge conference, no instruction on this defense was requested and there was no objection to its omission. Nor does defendant contend in this motion that the jury should have been so instructed. *See Hennessy,* 864 F.Supp. at 762 n. 2.

23. This instruction refers to defendant's "racial bias" and "racial attitude"—and not to retaliatory animus. Plaintiff, on that basis, argues that the reference to "direct evidence" could not have been prejudicial inasmuch as he did not prevail on the race discrimination claim. However, given the factual context, it is hard to separate the two completely.

24. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence." Fed.R.Evid. 401.

25. It is not argued that the evidence should have been excluded for any other reason.

26. Plaintiff's supervisor, who wrote the "workshedding memorandum" for the forced ranking committee, *supra* at 9, was also directly involved in defendant's response to the graffiti incident. Feb. 10, 1995, N.T. 95–99.

27. In *Glass,* our Circuit stated:
> The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of his own motives.

34 F.3d at 195 (citing *Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1103 (8th Cir.1988)).

Additionally, it is extremely doubtful that the term "direct" prejudicially affected the jury. *See Mooney v. Aramco,* 54 F.3d 1207, 1216 (5th Cir.1995) (instructions not prejudicial if outcome unaffected). The graffiti incident was a minor part of the trial. Moreover, the distinction between direct and circumstantial evidence is often "subtle and difficult." *Price Waterhouse v. Hopkins,* 490 U.S. at 291, 109 S.Ct. at 1812 (Kennedy, J., dissenting). In a general instruction on direct and circumstantial evidence, the jury was told that it could consider both kinds of evidence in reaching its verdict, Feb. 15, 1995, charge, N.T. 10–11.

The term "direct evidence" has both an evidentiary and an employment law sense. *Id.* Failure to respond appropriately or an acquiescence can be equated with approval, acceptance, or actual expression. And silence, where there is a duty to respond, has been said "to speak with the voice of thunder." As a matter of employment law, had the company's managers said the words that appear in the graffiti, that would have constituted direct evidence of racial animus. *See Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994) (direct evidence is evidence directly reflecting a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process). In this way a condonation or acquiescence in the graffiti can be regarded as direct evidence of company animus—in contrast with evidence of pretext, which is circumstantial. It was for this reason that the instruction, using the term "direct evidence," was given. The jury had previously been instructed that the evidentiary effect of the pretext syllogism was "circumstantial." Feb. 15, 1995, charge, N.T. 6.

## V.

■ Defendant asks that the judgment representing loss of future earnings should be reduced to present worth pursuant to a pre-verdict stipulation. During the charge conference, counsel agreed, in lieu of a present worth instruction, to mold a future earnings verdict via a four percent annual discount rate over a five-year period. The stipulation was made of record. Feb. 14, 1995, N.T. 70. Citing *Kaczkowski v. Bolubasz,* 491

Pa. 561, 421 A.2d 1027 (1980), plaintiff now argues that no reduction is necessary under the PHRA. Without regard to the merits of such hindsight, counsel's pre-instructions agreement will be enforced. It is not desirable or feasible to go back to the point where counsel chose to agree on the applicable law and the case proceeded on that basis. Defendant's unopposed method of calculation will be employed, and the future earnings portion of the verdict will be reduced from $397,845 to $327,698.72.

## VI.

■ Plaintiff's motion for prejudgment interest on the backpay award will be granted. Defendant's objection is that counsel stipulated before trial to a total backpay award of $150,000. During closing arguments, plaintiff's counsel referred to the amount as "$150,000 worth of past losses," Feb. 15, 1995, N.T. 34, and defendant's counsel said these were losses "up to today." *Id.* at 66. Neither statement purports to include interest, and the stipulation itself does not exclude prejudgment interest, albeit defendant may not have expected such a claim. Technically, plaintiff's position is correct. No objection having been made to the six percent interest rate or the method of calculation, prejudgment interest of $9,000 will be added to the verdict.

## ORDER

AND NOW, this 4th day of August, 1995, defendant Scott Paper Company's renewed motion for judgment as a matter of law, to alter the judgment or, in the alternative, for a new trial, is granted in part and denied in part. Plaintiff James W. Woodson's motion for prejudgment interest of $9,000 is granted. The judgment as altered is $1,496,698.70.